1  David & Suzanne Douglas
2  2300 E. Hartley Road
3  Ozark , MO  65721
4

5              UNITED STATES DISTRICT COURT
6              WESTERN DISTRICT OF MISSOURI

**David & Suzanne Douglas**          Case # 10-3378-CV-S-RED

Plaintiff,

    vs.                          PETITION FOR TEMPORARY

                                     INJUNCTION

**Sovereign Bank**

Defendant

7

8                        Date: 9-16-10

9   Comes now David & Suzanne Douglas , hereinafter referred to as "Petitioner," and moves the

10  court for relief as herein requested:

11                              **PARTIES**

12  Petitioner is David & Suzanne Douglas ,  2300 E. Hartley Road   Ozark  MO 65721. Currently

13  Known Defendant(s) are/is:  Sovereign Bank

14                         **STATEMENT OF CAUSE**

15  Petitioner, entered into a consumer contract for the refinance of a primary residence located at

16  2300 E. Hartley Road  , hereinafter referred to as the "property."

17  Defendants, acting in concert and collusion with others, induced Petitioner to enter into a

18  predatory loan agreement with Defendant.

19  Defendants committed numerous acts of fraud against Petitioner in furtherance of a carefully

20  crafted scheme intended to defraud Petitioner.

21  Defendants failed to make proper notices to Petitioner that would have given Petitioner warning

22  of the types of tactics used by Defendants to defraud Petitioner.

23  Defendants charged false fees to Petitioner at settlement.

PRELIMINARY INJUNCTION              1 of 26

Case 6:10-cv-03378-RED   Document 3   Filed 09/16/10   Page 1 of 26

24 Defendants used the above referenced false fees to compensate agents of Petitioner in order to
25 induce said agents to breach their fiduciary duty to Petitioner.

26 Defendant's attorney caused to be initiated collection procedures, knowing said collection
27 procedures in the instant action were frivolous as lender is estopped from collection procedures,
28 under authority of Uniform Commercial Code 3-501, subsequent to the request by Petitioner for
29 the production of the original promissory note alleged to create a debt.

30 **IN BRIEF**
31 *(Non-factual Statement of Posture and Position)*

32 It is not the intent of Petitioner to indict the entire industry. It is just that Plaintiff will be
33 making a number of allegations that, outside the context of the current condition of the real
34 estate industry, may seem somewhat outrageous and counter-intuitive.

35 When Petitioner accuses ordinary individuals of acting in concert and collusion with an
36 ongoing criminal conspiracy, it tends to trigger an incredulous response as it is
37 unreasonable to consider that all Agents, loan agents, appraisers, and other ordinary
38 people, just doing what they have been trained to do, are out to swindle the poor or
39 unsuspecting borrower.

40 The facts Petitioner is prepared to prove are that Petitioner has been harmed by fraud
41 committed by people acting in concert and collusion, one with the other. Petitioner has no
42 reason to believe that the Agent, loan officer, appraiser, and others were consciously aware
43 that what they were doing was part of an ongoing criminal conspiracy, only that it was,
44 and they, at the very least, kept themselves negligently uninformed of the wrongs they
45 were perpetrating. Petitioner maintains the real culprit is the system itself, including the
46 courts, for failure to strictly enforce the consumer protection laws.

47 **CAREFULLY CRAFTED CRIMINAL CONNIVANCE**
48 *(General State of the Real Estate Industry)*

49 ***THE BEST OF INTENTIONS***

50 Prior to the 1980's and 1990's ample government protections were in place to protect
51 consumers and the lending industry from precisely the disaster we now experience.
52 During President Clinton's administration, under the guise of making housing available to

Case 6:10-cv-03378-RED   Document 3   Filed 09/16/10   Page 2 of 26

53  the poor, primary protections were relaxed which had the effect of releasing he
54  unscrupulous on the unwary.

55  Prior to deregulation in the 1980's, lenders created loans for which they held and assumed
56  the risk.  Consequently, Americans were engaged in safe and stable home mortgages.
57  With the protections removed, the unscrupulous lenders swooped in and, instead of
58  making loans available to the poor, used the opportunity to convince the unsophisticated
59  American public to do something that had been traditionally taboo; home buyers were
60  convinced to speculate with their homes, their most important investment.

61  Sovereign Bank , Ameriquest, Countrywide, and many others swooped in and convinced
62  Americans to sell their homes, get out of their safe mortgage agreements, and speculate
63  with the equity they had gained by purchasing homes they could not afford.  Lenders
64  created loans intended to fail as, under the newly crafted system, the Lender profited more
65  from a mortgage default than from a stable loan.

66  Companies cropped up who called themselves banks when, in fact, they were only either
67  subsidiaries of banks, or unaffiliated companies that were operated for the purpose of
68  creating and selling promissory notes.  As will be demonstrated, these companies then
69  profited from the failure of the underlying loans.

70  ***HOW IT WORKS***

71  Briefly, how it works is this, the Lender would secure a large loan from a large bank,
72  convert that loan into 20 and 30 year mortgages _and_ then sell the promise to pay to an
73  investor.

74  People would set up mortgage companies buy securing a large loan from one of the major
75  banks, then convert that loan into 20 and 30 year mortgages.  In order to accomplish this
76  an Agent would contract with a seller to find a buyer, bring both seller and buyer to a
77  lender who would secure the title from the seller using the borrowed bank funds for that
78  purpose, and then trade the title to the buyer in exchange for a promissory note.

79  The lender then creates a 20 or 30 year mortgage with money the lender must repay within
80  6 months.  As soon as the closing is consummated, the promissory note is sold to an
81  investor pool.

82  Using the instant case as an example, a $170,000.00 note at 6.7020%%  interest over 30
83  years will produce $190,591.12    The lender can then offer to the investor the security

PRELIMINARY INJUNCTION            3 of 26

84  instrument (promissory note) at say 50% of it's future value.  The investor will, over  he
85  life of the note, less approximately 3.00% servicing fees, realize $193,796.62 .  The len ler
86  can then pay back the bank and retain a handsome profit in the amount of $35,784.04.  T he
87  lender, however, is not done with the deal.

88  The lender signed over the promissory note to the investor at the time of the trade, but  lid
89  not sign over the lien document (mortgage or deed of trust).  The State of Kansas Supre ne
90  Court addressed this issue and stated that such a transaction was certainly legal.  Howev ar,
91  it created a fatal flaw as the holder of the lien document, at time of sale of the secur ity
92  instrument, received consideration in excess of the lien amount.  Since the lien hol er
93  received consideration, he could not be harmed.   Therefore the lien became  an
94  unenforceable document.

95  This begs the question: if keeping the lien would render it void, why would the lender  iot
96  simply transfer the lien with the promissory note?  The reason is because the lender w ill
97  hold the lien for three years, file an Internal Revenue Service Form 1099a, claim the f ill
98  amount of the lien as abandoned funds, and deduct the full amount from the lender's t ax
99  liability.  The lender, by this maneuver, gets consideration a second time.  And still t e
100  lender is not done profiting from the deal.

101  After sale of the promissory note, the lender remains as the servicer for the investor.  T e
102  lender will receive 3% of each payment the lender collects and renders to the invest or
103  pool.  However, if the payment is late, the lender is allowed to assess an extra 5% and ke :p
104  that amount.  Also, if the loan defaults, the lender stands to gain thousands for handling t e
105  foreclosure.

106  The lender stands to profit more from a note that is overly expensive, than from a go d
107  stable loan.   And where, you may ask, does all this profit come from?  It comes from t e
108  equity the borrower had built up in the home.  And still the lender is not finished profiti g
109  from the deal.

110  Another nail was driven in the American financial coffin when on the last day Congre ss
111  was in session in 2000 when restrictions that had been in place since the econom ic
112  collapse of 1907 were removed.   Until 1907  investors were allowed to bet on stoc :s
113  without actually buying them.   This unbridled speculation led directly to an econom ic
114  collapse.  As a result the legislature banned the practice, until the year 2000.  In 2000 t e
115  unscrupulous lenders got their way on the last day of the congressional session.  Congre ss

Case 6:10-cv-03378-RED   Document 3   Filed 09/16/10   Page 4 of 26

116  removed the restriction banning derivatives and again allowed the practice, this time
117  taking only 8 years to crash the stock market.  This practice allowed the lender to profit
118  further from the loan by betting on the failure of the security instrument he had just sold to
119  the unwary investor, thus furthering the purpose of the lender to profit from both the
120  borrower (consumer) and the investor.

121  The failure of so many loans recently resulted in a seven hundred and fifty billion dollar
122  bailout at the expense of the taxpayer.  The unsuspecting consumer was lulled into
123  accepting the pronouncements of the lenders, appraisers, underwriters, and trustees as all
124  were acting under the guise of government regulation and, therefore, the borrower had
125  reason to expect good and fair dealings from all.  Unfortunately, the regulations in place to
126  protect the consumer from just this kind of abuse were simply being ignored.

127  The loan origination fee from the HUD1 settlement statement is the finder's fee paid for
128  the referral of the client to the lender by a person acting as an agent for the borrower.
129  Hereinafter, the person or entity who receives any portion of the yield spread premium, or
130  a commission of any kind consequent to securing the loan agreement through from the
131  borrower will be referred to as "Agent."  The fee, authorized by the consumer protection
132  law is restricted to 1% of the principal of the note.  It was intended that the Agent, when
133  seeking out a lender for the borrower, would seek the best deal for his client rather than
134  who would pay him the most.  That was the intent, but not the reality.  The reality is that
135  Agents never come away from the table with less than 2% or 3% of the principal.  This is
136  accomplished by undisclosed fees to the Agent in order to induce the Agent to breach his
137  fiduciary duty to the borrower and convince the borrower to accept a more expensive loan
138  product than the borrower qualifies for.  This will generate more profits for the lender and,
139  consequently, for the Agent.

140  It is a common practice for lenders to coerce appraisers to give a higher appraisal than is
141  the fair market price.  This allows the lender to increase the cost of the loan product and
142  give the impression that the borrower is justified in making the purchase.

143  The lender then charges the borrower an underwriting fee in order to convince the
144  borrower that someone with knowledge has gone over the conditions of the note and
145  certified that they meet all legal criteria.  The trustee, at closing, participates actively in the
146  deception of the borrower by placing undue stress on the borrower to sign the large stack
147  of paperwork without reading it.  The trustee is, after all, to be trusted and has been paid to

PRELIMINARY INJUNCTION                5 of 26

148  insure the transaction. This trust is systematically violated for the purpose of taking unfair
149  advantage of the borrower. The entire loan process is a carefully crafted contrive
150  connivance designed and intended to induce the unsophisticated borrower into accepting a
151  loan product that is beyond the borrowers means to repay. With all this, it should be a
152  surprise to no one that this country is having a real estate crisis.

### PETITIONER WILL PROVE THE FOLLOWING

154  Petitioner is prepared to prove, by a preponderance of evidence that:

155  • Lender has no legal standing to bring collection or foreclosure claims against the
156    property;

157  • Lender is not a real party in interest in any contract which can claim a collateral
158    interest in the property;

159  • even if Lender were to prove up a contract to which Lender had standing to enforce
160    against Petitioner, no valid lien exists which would give Lender a claim against the
161    property;

162  • even if Lender were to prove up a contract to which Lender had standing to enforce
163    against Petitioner, said contract was fraudulent in its creation as endorsement was
164    secured by acts of negligence, common law fraud, fraud by non-disclosure, fraud in
165    the inducement, fraud in the execution, usury, and breaches of contractual and
166    fiduciary obligations by Mortgagee or "Trustee" on the Deed of Trust, "Mortgage
167    Agents," "Loan Originators," "Loan Seller," "Mortgage Aggregator," "Trustee of
168    Pooled Assets," "Trustee or officers of Structured Investment Vehicle,"
169    "Investment Banker," "Trustee of Special Purpose Vehicle/Issuer of Certificates of
170    'Asset-Backed Certificates,'" "Seller of 'Asset-Backed' Certificates (shares or
171    bonds)," "Special Servicer" and Trustee, respectively, of certain mortgage loans
172    pooled together in a trust fund;

173  • Defendants have concocted a carefully crafted connivance wherein Lender
174    conspired with Agents, et al, to strip Petitioner of Petitioner's equity in the property
175    by inducing Plaintiff to enter into a predatory loan inflated loan product;

176  • Lender received unjust enrichment in the amount of 5% of each payment made late
177    to Lender while Lender and Lender's assigns acted as servicer of the note;

PRELIMINARY INJUNCTION          6 of 26

178      •    Lender and Lender's assigns, who acted as servicer in place of Lender, profited by

179           handling the foreclosure process on a contract Lender designed to have a high

180           probability of default;

181      •    Lender intended to defraud Investor by converting the promissory note into a

182           security instrument and selling same to Investor;

183      •    Lender intended to defraud Investor and the taxpayers of the United States by

184           withholding the lien document from the sale of the promissory note in order that

185           Lender could then hold the lien for three years, then prepare and file Internal

186           Revenue Form 1099a and falsely claim the full lien amount as abandoned funds

187           and deduct same from Lender's income tax obligation;

188      •    Lender defrauded backers of derivatives by betting on the failure of the promissory

189           note the lender designed to default;

190      •    participant Defendants, et al, in the securitization scheme described herein have

191           devised business plans to reap millions of dollars in profits at the expense of

192           Petitioner and others similarly situated.

193                              **PETITIONER SEEKS REMEDY**

194    In addition to seeking compensatory, consequential and other damages, Petitioner seeks

195    declaratory relief as to what (if any) party, entity or individual or group thereof is the

196    owner of the promissory note executed at the time of the loan closing, and whether the

197    Deed of Trust (Mortgage) secures any obligation of the Petitioner, and a Mandatory

198    Injunction requiring re-conveyance of the subject property to the Petitioner or, in the

199    alternative a Final Judgment granting Petitioner Quiet Title in the subject property.

200    ***PETITIONER HAS BEEN HARMED***

201    Petitioner has suffered significant harm and detriment as a result of the actions of Defendants.

202    Such harm and detriment includes economic and non-economic damages, and injuries to

203    Petitioner's mental and emotional health and strength, all to be shown according to proof at trial.

204    In addition, Petitioner will suffer grievous and irreparable further harm and detriment unless the

205    equitable relief requested herein is granted.

Case 6:10-cv-03378-RED    Document 3    Filed 09/16/10    Page 7 of 26

**STATEMENT OF CLAIM**

207       *DEFENDANTS LACK STANDING*

208            **No evidence of Contractual Obligation**

209   Defendants claim a controversy based on a contractual violation by Petitioner but have failed to

210   produce said contract. Even if Defendants produced evidence of the existence of said contract in

211   the form of an allegedly accurate photocopy of said document, a copy is only hearsay evidence

212   that a contract actually existed at one point in time. A copy, considering the present state of

213   technology, could be easily altered. As Lender only created one original and that original was

214   left in the custody of Lender, it was imperative that Lender protect said instrument.

215   In as much as the Lender is required to present the original on demand of Petitioner, there can be

216   no presumption of regularity when the original is not so produced. In as much as Lender has

217   refused Petitioner's request of the chain of custody of the security instrument in question by

218   refusing to identify all current and past real parties in interest, there is no way to follow said

219   chain of custody to insure, by verified testimony, that no alterations to the original provisions in

220   the contract have been made. Therefore, the alleged copy of the original is only hearsay

221   evidence that an original document at one time existed. Petitioner maintains that, absent

222   production of admissible evidence of a contractual obligation on the part of Petitioner,

223   Defendants are without standing to invoke the subject matter jurisdiction of the court.

224            **No Proper Evidence of Agency**

225   Defendants claim agency to represent the principal in a contractual agreement involving

226   Petitioner, however, Defendants have failed to provide any evidence of said agency other than a

227   pronouncement that agency has been assigned by some person, the true identity and capacity of

228   whom has not been established. Defendants can hardly claim to be agents of a principal then

229   refuse to identify said principal. All claims of agency are made from the mouth of the agent with

230   no attempt to provide admissible evidence from the principal.

231   Absent proof of agency, Defendants lack standing to invoke the subject matter jurisdiction of the

232   court.

Case 6:10-cv-03378-RED   Document 3   Filed 09/16/10   Page 8 of 26

233 **Special Purpose Vehicle**

234 Since the entity now claiming agency to represent the holder of the security instrument is not the
235 original lender, Petitioner has reason to believe that the promissory note, upon consummation of
236 the contract, was converted to a security and sold into a special purpose vehicle and now resides
237 in a Real Estate Mortgage Investment Conduit (REMIC) as defined by the Internal Revenue
238 Code and as such, cannot be removed from the REMIC as such would be a prohibited
239 transaction. If the mortgage was part of a special purpose vehicle and was removed on
240 consideration of foreclosure, the real party in interest would necessarily be the trustee of the
241 special purpose vehicle. Nothing in the pleadings of Defendants indicates the existence of a
242 special purpose vehicle, and the lack of a proper chain of custody documentation gives Petitioner
243 cause to believe defendant is not the proper agent of the real party in interest.

244 *CRIMINAL CONSPIRACY AND THEFT*

245 Defendants, by and through Defendant's Agents, conspired with other Defendants, et al, toward
246 a criminal conspiracy to defraud Petitioner. Said conspiracy but are not limited to acts of
247 negligence, breach of fiduciary duty, common law fraud, fraud by non-disclosure, and tortuous
248 acts of conspiracy and theft, to include but not limited to, the assessment of improper fees to
249 Petitioner by Lender, which were then used to fund the improper payment of commission fees to
250 Agent in order to induce Agent to violate Agent's fiduciary duty to Petitioner.

251 *AGENT PRACTICED UP-SELLING*

252 By and through the above alleged conspiracy, Agent practiced up-selling to Petitioner. In so
253 doing, Agent violated the trust relationship actively cultivated by Agent and supported by fact
254 that Agent was licensed by the state. Agent further defrauded Petitioner by failing to disclose
255 Agent's conspiratorial relationship to Lender, Agent violated Agent's fiduciary duty to
256 Petitioner and the duty to provide fair and honest services, through a series of carefully crafted
257 connivances, wherein Agent proactively made knowingly false and misleading statements of
258 alleged fact to Petitioner, and by giving partial disclosure of facts intended to directly mislead
259 Petitioner for the purpose of inducing Petitioner to make decisions concerning the acceptance of
260 a loan product offered by the Lender. Said loan product was more expensive than Petitioner
261 could legally afford. Agent acted with full knowledge that Petitioner would have made a
262 different decision had Agent given complete disclosure.

Case 6:10-cv-03378-RED   Document 3   Filed 09/16/10   Page 9 of 26

263    ### *FRAUDULENT INDUCEMENT*

264    Lender maliciously induced Petitioner to accept a loan product, Lender knew, or should have
265    known, Petitioner could not afford in order to unjustly enrich Lender.

266    ### *EXTRA PROFIT ON SALE OF PREDATORY LOAN PRODUCT*

267    Said more expensive loan product was calculated to produce a higher return when sold as a
268    security to an investor who was already waiting to purchase the loan as soon as it could be
269    consummated.

270    #### Extra Commission for Late Payments

271    Lender acted with deliberate malice in order to induce Petitioner to enter into a loan agreement
272    that Lender intended Petitioner would have difficulty paying.  The industry standard payment to
273    the servicer for servicing a mortgage note is 3% of the amount collected.  However, if the
274    borrower is late on payments, a 5% late fee is added and this fee is retained by the servicer.
275    Thereby, the Lender stands to receive more than double the regular commission on collections if
276    the borrower pays late.

277    #### Extra Income for Handling Foreclosure

278    Lender acted with deliberate malice in order to induce petitioner to enter into a loan agreement
279    on which Lender intended petitioner to default.  In case of default, the Lender, acting as servicer,
280    receives considerable funds for handling and executing the foreclosure process.

281    #### Credit Default Swap Gambling

282    Lender, after deliberately creating a loan intended to default is now in a position to bet on credit
283    default swap, commonly referred to as a derivative as addressed more fully below.  Since Lender
284    designed the loan to fail, betting on said failure is essentially a sure thing.

285    ### *LENDER ATTEMPTING TO FRAUDULENTLY COLLECT ON VOID LIEN*

286    Lender sold the security instrument after closing and received consideration in an amount in
287    excess of the lien held by Lender.  Since Lender retained the lien document upon the sale of the
288    security instrument, Lender separated the lien from said security instrument, creating a fatal and
289    irreparable flaw.

Case 6:10-cv-03378-RED   Document 3   Filed 09/16/10   Page 10 of 26

290     When Lender received consideration while still holding the lien and said consideration was in
291     excess of the amount of the lien, Lender was in a position such that he could not be harmed and
292     could not gain standing to enforce the lien. The lien was, thereby, rendered void.

293     Since the separation of the lien from the security instrument creates such a considerable concern,
294     said separation certainly begs a question: "Why would the Lender retain the lien when selling the
295     security instrument?"

296     When you follow the money the answer is clear. The Lender will hold the lien for three years,
297     then file an IRS Form 1099a and claim the full amount of the lien as abandoned funds and deduct
298     the full amount from Lender's tax liability, thereby, receiving consideration a second time.

299     Later, in the expected eventuality of default by petitioner, Lender then claimed to transfer the
300     lien to the holder of the security, however, the lien once satisfied, does not gain authority just
301     because the holder, after receiving consideration, decides to transfer it to someone else.

302     ***LENDER PROFIT BY CREDIT DEFAULT SWAP DERIVATIVES***

303     Lender further stood to profit by credit default swaps in the derivatives market, by way of inside
304     information that Lender had as a result of creating the faulty loans sure to default. Lender was
305     then free to invest on the bet that said loan would default and stood to receive unjust enrichment
306     a third time. This credit default swap derivative market scheme is almost totally responsible for
307     the stock market disaster we now experience as it was responsible for the stock market crash in
308     1907.

309     ***LENDER CHARGED FALSE FEES***

310     Lender charged fees to Petitioner that were in violation of the limitations imposed by the Real
311     Estate Settlement Procedures Act as said fees were simply contrived and not paid to a third party
312     vendor.

313     Lender charged other fees that were a normal part of doing business and should have been
314     included in the finance charge.

315     Below is a listing of the fees charged at settlement. Neither at settlement, nor at any other time
316     did Lender or Trustee provide documentation to show that the fees herein listed were valid,
317     necessary, reasonable, and proper to charge Petitioner.

PRELIMINARY INJUNCTION         11 of 26

| | | |
|---|---|---:|
| 803 | Appraisal | $27...00 |
| 808 | Credit report fee | $1...50 |
| 809 | Underwriting fee | $39...00 |
| 810 | County tax fee | $67...77 |
| 811 | Overnight Fee | $4...00 |
| 812 | Flood L.O.L. Fee | $1...00 |
| 813 | MERS fee | $3...00 |
| 814 | Doc retrieval fee | $4...00 |
| 901 | Interest from 12/13/06 to 1/1/07 @ 31.2847 /day ( days) | $59...41 |
| 903 | Hazard Insurance Premium | $1,17...89 |
| 1001 | Hazard Insurance | $39...41 |
| 1004 | County Property Taxes | $16...18 |
| 1101 | Settlement Fee | $20...00 |
| 1103 | Title examination fee | $15...00 |
| 1108 | Title insurance fee | $34...50 |
| 1201 | Recording Fee | $6...00 |

318 Debtor is unable to determine whether or not the above fees are valid in accordance with the

319 restrictions provided by the various consumer protection laws. Therefore, please provide; a

320 complete billing from each vendor who provided the above listed services; the complete contact

321 information for each vendor who provided a billed service; clearly stipulate as to the specific

322 service performed; a showing that said service was necessary; a showing that the cost of said

323 service is reasonable; a showing of why said service is not a regular cost of doing business that

324 should rightly be included in the finance charge.

325 The above charges are hereby disputed and deemed unreasonable until such time as said charges

326 have been demonstrated to be reasonable, necessary, and in accordance with the limitations and

327 restrictions included in any and all laws, rules, and regulations intended to protect the consumer.

328 In the event lender fails to properly document the above charges, borrower will consider same as

329 false charges. The effect of the above amounts that borrower would pay over the life of the note

330 will be an overpayment of $38,989.54 This amount will be reduced by the amount of items

331 above when said items are fully documented.

332 ***RESPA PENALTY***

333 From a cursory examination of the records, with the few available, the apparent RESPA

334 violations are as follows: Good Faith Estimate not within limits, No HUD-1 Booklet, Truth In

335 Lending Statement not within limits compared to Note, Truth in Lending Statement not timely

336 presented, HUD-1 not presented at least one day before closing, No Holder Rule Notice in Note,

337 No 1st Payment Letter.

PRELIMINARY INJUNCTION        12 of 26

338     The closing documents included no signed and dated : Financial Privacy Act Disclosure; Equal
339     Credit Reporting Act Disclosure; notice of right to receive appraisal report; servicing disclosure
340     statement; borrower's Certification of Authorization; notice of credit score; RESPA servicing
341     disclosure letter; loan discount fee disclosure; business insurance company arrangement
342     disclosure; notice of right to rescind.

343     The courts have held that the borrower does not have to show harm to claim a violation of the
344     Real Estate Settlement Procedures Act, as the Act was intended to insure strict compliance. And,
345     in as much as the courts are directed to assess a penalty of no less than two hundred dollars and
346     no more than two thousand, considering the large number enumerated here, it is reasonable to
347     consider that the court will assess the maximum amount for each violation.

348     Since the courts have held that the penalty for a violation of RESPA accrues at consummation of
349     the note, borrower has calculated that, the number of violations found in a cursory examination
350     of the note, if deducted from the principal, would result in an overpayment on the part of the
351     borrower, over the life of the note, of $158,177.16.

352     If the violation penalty amounts for each of the unsupported fees listed above are included, the
353     amount by which the borrower would be defrauded is $170,854.95

354     Adding in RESPA penalties for all the unsupported settlement fees along with the TILA/Note
355     variance, it appears that lender intended to defraud borrower in the amount of $368,068.51

356     ***LENDER CONSPIRED WITH APPRAISER***

357     Lender, in furtherance of the above referenced conspiracy, conspired with appraiser for the
358     purpose of preparing an appraisal with a falsely stated price, in violation of appraiser's fiduciary
359     duty to Petitioner and appraiser's duty to provide fair and honest services, for the purpose of
360     inducing Petitioner to enter into a loan product that was fraudulent toward the interests of
361     Petitioner.

362     ***LENDER CONSPIRED WITH TRUSTEE***

363     Lender conspired with the trust Agent at closing to create a condition of stress for the specific
364     purpose of inducing Petitioner to sign documents without allowing time for Petitioner to read and
365     fully understand what was being signed.

Case 6:10-cv-03378-RED   Document 3   Filed 09/16/10   Page 13 of 26

366 The above referenced closing procedure was a carefully crafted connivance, designed and
367 intended to induce Petitioner, through shame and trickery, in violation of trustee's fiduciary duty
368 to Petitioner and the duty to provide fair and honest services, to sign documents that Petitioner
369 did not have opportunity to read and fully understand, thereby, denying Petitioner full disclosure
370 as required by various consumer protection statutes.

371 ### *DECEPTIVE ADVERTISING AND OTHER UNFAIR BUSINESS PRACTICES*

372 In the manner in which Defendants have carried on their business enterprises, they have engaged
373 in a variety of unfair and unlawful business practices prohibited by *15 USC Section 45 et seq.*
374 (Deceptive Practices Act).

375 Such conduct comprises a pattern of business activity within the meaning of such statutes, and
376 has directly and proximately caused Petitioner to suffer economic and non-economic harm and
377 detriment in an amount to be shown according to proof at trial of this matter.

378 ### *EQUITABLE TOLLING FOR TILA AND RESPA*

379 The Limitations Period for Petitioners' Damages Claims under TILA and RESPA should be
380 Equitably Tolled due to the DEFENDANTS' Misrepresentations and Failure to Disclose

381 Any claims for statutory and other money damages under the Truth in Lending Act *(15 U.S.C. §*
382 *1601, et. seq.)* and under the Real Estate Settlement Procedures Act *(12 U.S.C. § 2601 et. seq.)*
383 are subject to a one-year limitations period; however, such claims are subject to the equitable
384 tolling doctrine. The Ninth Circuit has interpreted the TILA limitations period in § 1640(e) as
385 subject to equitable tolling. In *King v. California, 784 F.2d 910 (9th Cir.1986),* the court held
386 that given the remedial purpose of TILA, the limitations period should run from the date of
387 consummation of the transaction, but that "the doctrine of equitable tolling may, in appropriate
388 circumstances, suspend the limitations period until the borrower discovers or has reasonable
389 opportunity to discover the fraud or nondisclosures that form the basis of the TILA action." *King*
390 *v. California, 784 F.2d 910, 915 9*th Cir. 1986).

391 Likewise, while the Ninth Circuit has not taken up the question whether *12 U.S.C. § 2614,* the
392 anti-kickback provision of **RESPA,** is subject to equitable tolling, other Courts have, and hold
393 that such limitations period may be equitably tolled. The Court of Appeals for the District of
394 Columbia held that § 2614 imposes a strictly jurisdictional limitation, *Hardin v. City Title &*

Case 6:10-cv-03378-RED   Document 3   Filed 09/16/10   Page 14 of 26

Escrow Co., 797 F.2d 1037, 1039-40 (D.C. Cir. 1986), while the Seventh Circuit came to the opposite conclusion. *Lawyers Title Ins. Corp. v. Dearborn Title Corp., 118 F.3d 1157, 164 (7th Cir. 1997).* District courts have largely come down on the side of the Seventh Circuit in holding that the one-year limitations period in § 2614 is subject to equitable tolling. See, e.g., *Kerby v. Mortgage Funding Corp., 992 F.Supp. 787, 791-98 (D.Md.1998); Moll v. U.S. Life Title Ins. Co., 700 F.Supp. 1284, 1286-89 (S.D.N.Y.1988).* Importantly, the Ninth Circuit, as noted above, has interpreted the TILA limitations period in *15 U.S.C. § 1640* as subject to equitable tolling; the language of the two provisions is nearly identical. *King v. California, 784 F.2d at 914.* While not of precedential value, this Court has previously found both the TILA and **RESPA** limitations periods to be subject to equitable tolling. *Blaylock v. First American Title Ins. Co., 504 F.Supp.2d 1091,* (W.D. Wash. 2007). 1106-07.

The Ninth Circuit has explained that the doctrine of equitable tolling "focuses on excusable delay by the Petitioner," and inquires whether "a reasonable Petitioner would ... have known of the existence of a possible claim within the limitations period." *Johnson v. Henderson, 314 F.3d 409, 414 (9th Cir.2002), Santa Maria v. Pacific Bell, 202 F.3d 1170, 1178 (9th Cir.2000).* Equitable tolling focuses on the reasonableness of the Petitioner's delay and does not depend on any wrongful conduct by the Defendants. Santa Maria. at 1178.

### BUSINESS PRACTICES CONCERNING DISREGARDING OF UNDERWRITING STANDARDS

Traditionally, Lenders required borrowers seeking mortgage loans to document their income and assets by, for example, providing W-2 statements, tax returns, bank statements, documents evidencing title, employment information, and other information and documentation that could be analyzed and investigated for its truthfulness, accuracy, and to determine the borrower's ability to repay a particular loan over both the short and long term. Defendants deviated from and disregarded these standards, particularly with regard to its riskier and more profitable loan products.

### Low-Documentation/No-Documentation Loans.

Driven by its desire for market share and a perceived need to maintain competitiveness with the likes of Countrywide, Defendants began to introduce an ever increasing variety of low and no documentation loan products, including the ARMs and HELOCs described hereinabove, and began to deviate from and ease its underwriting criteria, and then to grant liberal exceptions to

PRELIMINARY INJUNCTION        15 of 26

426 the already eased underwriting standards to the point of disregarding such standards. This
427 quickened the loan origination process, allowing for the generation of more and more loans
428 which could then be resold and/or securitized in the secondary market.

429 Defendants marketed no-documentation/low-documentation loan programs that included ARMs
430 and HELOCs, among others, in which loans were given based on the borrower's "stated income"
431 or "stated assets" (SISA) neither of which were verified. Employment was verbally confirmed, if
432 at all, but not further investigated, and income, if it was even considered as a factor, was to be
433 roughly consistent with incomes in the types of jobs in which the borrower was employed. When
434 borrowers were requested to document their income, they were able to do so through information
435 that was less reliable than in a full-documentation loan.

436 For stated income loans, it became standard practice for loan processors, loan officers and
437 underwriters to rely on www.salary.com to see if a stated income was reasonable. Such stated
438 income loans, emphasizing loan origination from a profitability standpoint at the expense of
439 determining the ability of the borrower to repay the loan from an underwriting standpoint,
440 encouraged the overstating and/or fabrication of income.

441        **Easing of Underwriting Standards**

442 In order to produce more loans that could be resold in the secondary mortgage market,
443 Defendants also relaxed, and often disregarded, traditional underwriting standards used to
444 separate acceptable from unacceptable risk. Examples of such relaxed standards were reducing
445 the base FICO score needed for a SISA loan.

446 Other underwriting standards that Defendants relaxed included qualifying interest rates (the rate
447 used to determine whether borrowers can afford the loan), loan to value ratios (the amount of
448 loan(s) compared to the appraised/sale price of the property, whichever is lower), and debt-to-
449 income ratios (the amount of monthly income compared to monthly debt service payments and
450 other monthly payment obligations.

451 With respect to ARMS, Defendants underwrote loans without regard to the borrower's long-term
452 financial circumstances, approving the loan based on the initial fixed rate without taking into
453 account whether the borrower could afford the substantially higher payment that would
454 inevitably be required during the remaining term of the loan.

PRELIMINARY INJUNCTION                16 of 26

455 With respect to HELOCs, Defendants underwrote and approved such loans based only on the
456 borrower's ability to afford the interest-only payment during the initial draw period of the loan,
457 rather than on the borrower's ability to afford the subsequent, fully amortized principal and
458 interest payments.

459 As Defendants pushed to expand market share, they eased other basic underwriting standards.
460 For example, higher loan-to-value (LTV) and combined loan-to-value (CLTV) ratios were
461 allowed. Likewise, higher debt-to-income (DTI) ratios were allowed. At the same time that they
462 eased underwriting standards the Defendants also were encouraging consumers to go further into
463 debt in order to supply the very lucrative aftermarket of mortgage backed securities. The relaxed
464 underwriting standards created the aftermarket supply they needed. As a result, the Defendants
465 made it easy for the unwary consumer to take on more debt than he could afford by encouraging
466 unsound financial practices, all the while knowing defaults would occur more and more
467 frequently as the credit ratios of citizens reached the limit of the new relaxed underwriting
468 standards.

469 Defendants knew, or in the exercise of reasonable care should have known, from its own
470 underwriting guidelines industry standards that it was accumulating and selling/reselling risky
471 loans that were likely to end up in default. However, as the pressure mounted to increase market
472 share and originate more loans, Defendants began to grant "exceptions" even to its relaxed
473 underwriting guidelines. Such was the environment that loan officers and underwriters were,
474 from time to time, placed in the position of having to justify why they did not approve a loan that
475 failed to meet underwriting criteria.

476 **Risk Layering**

477 Defendants compromised its underwriting even further by risk layering, i.e. combining high risk
478 loans with one or more relaxed underwriting standards.

479 Defendants knew, or in the exercise of reasonable care should have known, that layered risk
480 would increase the likelihood of default. Among the risk layering Defendants engaged in were
481 approving ARM loans with little to no down payment, little to no documentation, and high
482 DTI/LTV/CLTV ratios. Despite such knowledge, Defendants combined these very risk factors in
483 the loans it promoted to borrowers.

Case 6:10-cv-03378-RED   Document 3   Filed 09/16/10   Page 17 of 26

484 Loan officers and mortgage Agents aided and abetted this scheme by working closely with other
485 mortgage Lenders/mortgage bankers to increase loan originations, knowing or having reason to
486 believe that Defendants and other mortgage Lenders/mortgage bankers with whom they did
487 business ignored basic established underwriting standards and acted to mislead the borrower, all
488 to the detriment of the borrower and the consumer of loan products..

489 Petitioner is informed and believe, and on that basis allege, that Defendants, and each of them,
490 engaged and/or actively participated in, authorized, ratified, or had knowledge of, all of the
491 business practices described above in paragraphs 30-42 of this Complaint

492 **_UNJUST ENRICHMENT_**

493 Petitioner is informed and believes that each and all of the Defendants received a benefit at
494 Petitioner's expense, including but not limited to the following: To the Agent, commissions,
495 yield spread premiums, spurious fees and charges, and other "back end" payments in amounts to
496 be proved at trial; To the originating Lender, commissions, incentive bonuses, resale premiums,
497 surcharges and other "back end" payments in amounts to be proved at trial; To the investors,
498 resale premiums, and high rates of return; To the servicers including EMS, servicing fees,
499 percentages of payment proceeds, charges, and other "back end" payments in amounts to be
500 proved at trial; To all participants, the expectation of future revenues from charges, penalties and
501 fees paid by Petitioner when the unaffordable LOAN was foreclosed or refinanced.

502 By their misrepresentations, omissions and other wrongful acts alleged heretofore, Defendants,
503 and each of them, were unjustly enriched at the expense of Petitioner, and Petitioner was unjustly
504 deprived, and is entitled to restitution in the amount of $368,068.51

505 **_CLAIM TO QUIET TITLE._**

506 Petitioner properly averred a claim to quiet title. Petitioner included both the street address, and
507 the Assessor's Parcel Number for the property. Petitioner has set forth facts concerning the title
508 interests of the subject property. Moreover, as shown above, Petitioner's claims for rescission
509 and fraud are meritorious. As such, Petitioner's bases for quiet title are meritorious as well.

510 Defendants have no title, estate, lien, or interest in the Subject Property in that the purported
511 power of sale contained in the Deed of Trust is of no force or effect because Defendants' security
512 interest in the Subject Property has been rendered void and that the Defendants are not the holder

in due course of the Promissory Note. Moreover, because Petitioner properly pled all Defendants' involvement in a fraudulent scheme, all Defendants are liable for the acts of its co-conspirators,

> "a Petitioner is entitled to damages from those Defendants who concur in the tortuous scheme with knowledge of its unlawful purpose." *Wyatt v. Union Mortgage Co., 24 Cal. 3d 773, 157 Cal. Rptr. 392, 598 P.2d 45 (1979); Novartis Vaccines and Diagnostics, In. v. Stop Huntingdon Animal Cruelty USA, Inc., 143 Cal. App. 4th 1284, 50 Cal. Rptr. 3d 27 (1st Dist. 2006); Kidron v. Movie Acquisition Corp., 40 Cal. App. 4th 1571, 47 Cal. Rptr. 2d 752 (2d Dist. 1995).*

### *SUFFICIENCY OF PLEADING*

Petitioner has sufficiently pled that relief can be granted on each and every one of the Complaint's causes of action. A complaint should not be dismissed "unless it appears beyond doubt that the Petitioner can prove no set of facts in support of Petitioner claim which would entitle Petitioner to relief." *Housley v. U.S. (9th Cir. Nev. 1994) 35 F.3d 400, 401.* "All allegations of material fact in the complaint are taken as true and construed in the light most favorable to Petitioner." *Argabright v. United States, 35 F.3d 1476, 1479 (9th Cir. 1996).*

Attendant, the Complaint includes a "short, plain statement, of the basis for relief." Fed. Rule Civ. Proc. 8(a). The Complaint contains cognizable legal theories, sufficient facts to support cognizable legal theories, and seeks remedies to which Petitioner is entitled. *Balistreri v. Pacifica Police Dept., 901 F.2d 696, 699 (9th Cir. 1988); King v. California, 784 F.2d 910, 913 (9th Cir. 1986).* Moreover, the legal conclusions in the Complaint can and should be drawn from the facts alleged, and, in turn, the court should accept them as such. *Clegg v. Cult Awareness Network, 18 F.3d 752 (9th Cir, 1994).* Lastly, Petitioner's complaint contains claims and has a probable validity of proving a "set of facts" in support of their claim entitling them to relief. *Housley v. U.S. (9th Cir. Nev. 1994) 35 F.3d 400, 401.* Therefore, relief as requested herein should be granted.

## CAUSES OF ACTION

### *BREACH OF FIDUCIARY DUTY*

Defendants Agent, appraiser, trustee, Lender, et al, and each of them, owed Petitioner a fiduciary duty of care with respect to the mortgage loan transactions and related title activities involving the Trust Property.

PRELIMINARY INJUNCTION     19 of 26

542 Defendants breached their duties to Petitioner by, *inter alia,* the conduct described above. Such
543 breaches included, but were not limited to, ensuring their own and Petitioners' compliance with
544 all applicable laws governing the loan transactions in which they were involved, including but
545 not limited to, TILA, HOEPA, **RESPA** and the Regulations X and Z promulgated there under.

546 Defendant's breaches of said duties were a direct and proximate cause of economic and non-
547 economic harm and detriment to Petitioner(s).

548 Petitioner did suffer economic, non-economic harm, and detriment as a result of such conduct,
549 all to be shown according to proof at trial of this matter.

550     *CAUSE OF ACTION - NEGLIGENCE/NEGLIGENCE PER SE*

551 Defendants owed a general duty of care with respect to Petitioners, particularly concerning their
552 duty to properly perform due diligence as to the loans and related transactional issues described
553 hereinabove.

554 In addition, Defendants owed a duty of care under TILA, HOEPA, **RESPA** and the Regulations
555 X and Z promulgated there under to, among other things, provide proper disclosures concerning
556 the terms and conditions of the loans they marketed, to refrain from marketing loans they knew
557 or should have known that borrowers could not afford or maintain, and to avoid paying undue
558 compensation such as "yield spread premiums" to mortgage Agents and loan officers.

559 Defendants knew or in the exercise of reasonable care should have known, that the loan
560 transactions involving Petitioner and other persons similarly situated were defective, unlawful,
561 violative of federal and state laws and regulations, and would subject Petitioner to economic and
562 non-economic harm and other detriment.

563 Petitioner is among the class of persons that TILA, HOEPA, **RESPA** and the Regulations X and
564 Z promulgated there under were intended and designed to protect, and the conduct alleged
565 against Defendants is the type of conduct and harm which the referenced statutes and regulations
566 were designed to deter.

567 As a direct and proximate result of Defendant's negligence, Petitioner suffered economic and
568 non-economic harm in an amount to be shown according to proof at trial.

Case 6:10-cv-03378-RED   Document 3   Filed 09/16/10   Page 20 of 26

569    **AGENT: COMMON LAW FRAUD**

570    If any Agents' misrepresentations made herein were not intentional, said misrepresentations were
571    negligent. When the Agents made the representations alleged herein, he/she/it had no reasonable
572    ground for believing them to be true.

573    Agents made these representations with the intention of inducing Petitioner to act in reliance on
574    these representations in the manner hereafter alleged, or with the expectation that Petitioner
575    would so act.

576    Petitioner is informed and believes that Agent et al, facilitated, aided and abetted various Agents
577    in their negligent misrepresentation, and that various Agents were negligent in not implementing
578    procedures such as underwriting standards oversight that would have prevented various Agents
579    from facilitating the irresponsible and wrongful misrepresentations of various Agents to
580    Defendants.

581    Petitioner is informed and believes that Agent acted in concert and collusion with others named
582    herein in promulgating false representations to cause Petitioner to enter into the LOAN without
583    knowledge or understanding of the terms thereof.

584    As a proximate result of the negligent misrepresentations of Agents as herein alleged, the
585    Petitioner sustained damages, including monetary loss, emotional distress, loss of credit, loss of
586    opportunities, attorney fees and costs, and other damages to be determined at trial. As a
587    proximate result of Agents' breach of duty and all other actions as alleged herein, Defendants has
588    suffered severe emotional distress, mental anguish, harm, humiliation, embarrassment, and
589    mental and physical pain and anguish, all to Petitioner's damage in an amount to be established
590    at trial.

591    ***PETITIONER PROPERLY AVERRED A CLAIM FOR BREACH OF THE IMPLIED***
592    ***COVENANT OF GOOD FAITH AND FAIR DEALING.***

593    Petitioner properly pled Defendants violated the breach of implied covenant of good faith and
594    fair dealing. "Every contract imposes upon each party a duty of good faith and fair dealing in its
595    performance and its enforcement." *Price v. Wells Fargo Bank, 213 Cal.App.3d 465, 478, 261*
596    *Cal. Rptr. 735 (1989);* Rest.2d Contracts § 205. A mortgage Agent has fiduciary duties. *Wyatt v.*

Case 6:10-cv-03378-RED   Document 3   Filed 09/16/10   Page 21 of 26

597 *Union Mortgage Co., (1979) 24 Cal. 3d. 773.* Further, In *Jonathan Neil & Associates, Inc. v*
598 *Jones, (2004) 33 Cal. 4th 917,* the court stated:

599     In the area of insurance contracts the covenant of good faith and fair dealing has taken on a
600     particular significance, in part because of the special relationship between the insurer and the
601     insured. The insurer, when determining whether to settle a claim, must give at least as much
602     consideration to the welfare of its insured as it gives to its own interests. . . The standard is
603     premised on the insurer's obligation to protect the insured's interests . . . *Id. at 937.*

604     Likewise, there is a special relationship between an Agent and borrower. "A person who
605     provides Agency services to a borrower in a covered loan transaction by soliciting Lenders or
606     otherwise negotiating a consumer loan secured by real property, is the fiduciary of the
607     consumer...this fiduciary duty [is owed] to the consumer regardless of whom else the Agent may
608     be acting as an Agent for . . . The fiduciary duty of the Agent is to deal with the consumer in
609     *good faith.* If the *Agent knew or should have known that the Borrower will or has a likelihood of*
610     *defaulting ... they have a fiduciary duty to the borrower not* to place them in that loan."
611     (California Department of Real Estate, *Section 8: Fiduciary Responsibility,* www.dre.ca.gov).
612     [*Emphasis Added*].

613     All Defendants, willfully breached their implied covenant of good faith and fair dealing with
614     Petitioner when Defendants: (1) Failed to provide all of the proper disclosures; (2) Failed to
615     provide accurate Right to Cancel Notices; (3) Placed Petitioner into Petitioner's current loan
616     product without regard for other more affordable products; (4) Placed Petitioner into a loan
617     without following proper underwriting standards; (5) Failed to disclose to Petitioner that
618     Petitioner was going to default because of the loan being unaffordable; (6) Failed to perform
619     valid and /or properly documented substitutions and assignments so that Petitioner could
620     ascertain Petitioner rights and duties; and (7) Failed to respond in good faith to Petitioner's
621     request for documentation of the servicing of Petitioner's loan and the existence and content of
622     relevant documents. Additionally, Defendants breached their implied covenant of good faith and
623     fair dealing with Petitioner when Defendants initiated foreclosure proceedings even without the
624     right under an alleged power of sale because the purported assignment was not recorded and by
625     willfully and knowingly financially profiting from their malfeasance. Therefore, due to the
626     special relationship inherent in a real estate transaction between Agent and borrower, *and* all
627     Defendants' participation in the conspiracy, the Motion to Dismiss should be denied.

Case 6:10-cv-03378-RED    Document 3    Filed 09/16/10    Page 22 of 26

628     ***CAUSE OF ACTION VIOLATION OF TRUTH IN LENDING ACT 15 U.S.C. § 1601 ET***
629     ***SEQ***

630     Petitioner hereby incorporates by reference, re-pleads and re-alleges each and every allegation
631     contained in all of the paragraphs of the General Allegations and Facts Common to All Causes of
632     Action as though the same were set forth herein.

633     Petitioner is informed and believes that Defendant's violation of the provisions of law rendered
634     the credit transaction null and void, invalidates Defendant's claimed interest in the Subject
635     Property, and entitles Petitioner to damages as proven at trial.

636     ***INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS***

637     The conduct committed by Defendants, driven as it was by profit at the expense of increasingly
638     highly leveraged and vulnerable consumers who placed their faith and trust in the superior
639     knowledge and position of Defendants, was extreme and outrageous and not to be tolerated by
640     civilized society.

641     Defendants either knew that their conduct would cause Petitioner to suffer severe emotional
642     distress, or acted in conscious and/or reckless disregard of the probability that such distress
643     would occur.

644     Petitioner did in fact suffer severe emotional distress as an actual and proximate result of the
645     conduct of Defendants as described hereinabove.

646     As a result of such severe emotional distress, Petitioner suffered economic and non economic
647     harm and detriment, all to be shown according to proof at trial of this matter.

648     Petitioner demands that Defendants provide Petitioner with release of lien on the lien signed by
649     Petitioner and secure to Petitioner quite title;

650     Petitioner demands Defendants disgorge themselves of all enrichment received from Petitioner
651     as payments to Defendants based on the fraudulently secured promissory note in an amount to be
652     calculated by Defendants and verified to Petitioner;

653     Petitioner further demands that Defendants pay to Petitioner an amount equal to treble the
654     amount Defendants intended to defraud Petitioner of which amount Petitioner calculated to be
655     equal to $1,104,205.53

PRELIMINARY INJUNCTION          23 of 26

Case 6:10-cv-03378-RED   Document 3   Filed 09/16/10   Page 23 of 26

## REQUEST FOR TEMPORARY INJUNCTION

Plaintiff will suffer imminent and irreparable injury if defendant is not enjoined from foreclosing on the property owned by Plaintiff. Fed. R. Civ. P. 65(b)(1); *see Sampson v. Murray*, 415 U.S. 61, 88-89 & n.59, 94 S. Ct. 937, 951-52 & n.59 (1974).

There is no adequate remedy at law because once the foreclosure sale has taken place Plaintiff will suffer the complete loss of the property as defendant will sell the property to a third party who will have a right to possession without regard to the claims Plaintiff has against defendant. {*See N. Cal. Power Agency v. Grace Geothermal Corp.*, 469 U.S. 1306, 1306, 105 S. Ct. 459, 459 (1984); *Wilson v. Ill. S. Ry. Co.*, 263 U.S. 574, 576-77, 44 S. Ct. 203, 203-04 (1924); *Winston v. Gen. Drivers, Warehousemen & Helpers Local Un. No. 89*, 879 F. Supp. 719, 725 (W.D. Ky. 1995.*

There is a substantial likelihood that plaintiff will prevail on the merits. *Schiavo v. Schiavo*, 403 F.3d 1223, 1225 (11th Cir. 2005). Plaintiff will be able to show that:

Defendant has no agency to represent the real party in interest;

- that the alleged real party in interest is unable to prove standing foreclose against and sell the property;

- that the lender committed numerous acts, as listed above, that have the effect of rendering the contract, through which defendant claims authority, void and unenforceable.

The threatened harm to plaintiff outweighs the harm that a preliminary injunction would inflict on defendant. *Schiavo*, 403 F.3d at 1225-26. If defendant is temporarily restrained from selling the instant property, the defendant and plaintiff will benefit as if plaintiff is forced to vacate the property, the property will sit empty for the duration of the action. Plaintiff will suffer loss of the use of said property and will loose opportunity to maintain same and defendant will suffer loss by having to maintain an empty property that cannot be insured.

Issuance of a preliminary injunction would not adversely affect the public interest and public policy because there are already a great number of empty houses with the current residential foreclosure mess. Adding more will simply increase the burden on the local as it will create opportunity for vandalism and further other criminal activity.

PRELIMINARY INJUNCTION          24 of 26

685    Plaintiff is willing to post a bond in the amount the court deems appropriate.

686    The court should enter this preliminary injunction without notice to defendan because
687    plaintiff will suffer immediate and irreparable injury, loss, or damage if the order is no t granted
688    before defendant can be heard as **defendant has made it clear that sale and eviction of the**
689    **property are imminent.** *First Tech. Safety Sys. v. Depinet*, 11 F.3d 641, 650 (6th Cir. 1993). If
690    said sale is allowed to take place, Plaintiff will be irreparably harm. {*See O'Connor' Federal*
691    *Rules, "Ex parte," ch. 2-D, §3.1.3, p. 77.*}

692    Plaintiff asks the court to set the request for a preliminary injunction for hearing at the
693    earliest possible time.

694                                 **CONCLUSION**

695    13. Plaintiff has filed suit against defendant wherein Plaintiff has claimed numerous causes
696    of action against defendant. A number of the allegations made by Plaintiff are incontrovertable
697    by defendant, therefore, Plaintiff will prevail on a number of the above allegations by way if
698    existing records. For these reasons, plaintiff asks the court to issue a preliminary injunction
699    preventing defendant from foreclosing on the property.

700                                    **PRAYER**

701    15. For these reasons, plaintiff asks that the court do the following:

702        a.    Defendant be prevented from foreclosing on and selling the property until and
703              unless defendant prevails in the current litigation.

704        b.    Enter judgment for plaintiff.

705        c.    Award costs of court.

706        d.    Grant any other relief it deems appropriate.

707    **Respectfully Submitted,**
708
709
710    David Douglas                    Suzanne Douglas
711

Case 6:10-cv-03378-RED   Document 3   Filed 09/16/10   Page 25 of 26

# VERIFICATION

715  We, David & Suzanne Douglas , do swear and affirm that all statements made herein are true
716  and accurate, in all respects, to the best of my knowledge.

717  David & Suzanne Douglas
718  2300 E. Hartley Road
719  Ozark , MO
720

721  The Person above, who proved to me on the basis of satisfactory evidence to be the person

722  whose name is subscribed to this document and acknowledged to me that he/she executed the

723  same in his authorized capacity and that by his signature on this instrument who is the person

724  who executed this instrument.

725  I certify under PENALTY OF PERJURY under the laws of this State that the foregoing

726  paragraph is true and correct.

727

728  Witness my hand and official seal.

729

730  ~Shirley A Wolfe~ (signature)

" NOTARY  SEAL "
Shirley A. Wolfe, Notary Public
Greene County, State of Missouri
My Commission Expires 7/22/2012
Commission Number 0847033

731  **NOTARY PUBLIC IN AND FOR**          Notary Seal

732  **THE STATE OF MISSOURI**

733

PRELIMINARY INJUNCTION          26 of 26